Michelle L. LINDALE, Plaintiff–Appellee,

v.

TOKHEIM CORPORATION,
Defendant–Appellant.

Nos. 97–1591, 97–2265.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 11, 1997.

Decided May 29, 1998.

Rehearing and Suggestion for Rehearing
en banc Denied June 26, 1998.

Cynthia Rockwell, Haller & Colvin, Fort Wayne, IN, John C. Hamilton (argued), Doran, Blackmond, Ready, Hamilton & Williams, South Bend, IN, for Plaintiff–Appellee.

Robert O. Vegeler, Beers, Mallers, Backs & Salin, Fort Wayne, IN, Maureen E. Mahoney (argued), Latham & Watkins, Washington, DC, Mary R. Alexander, Latham & Watkins, Chicago, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and EASTERBROOK and RIPPLE, Circuit Judges.

POSNER, Chief Judge.

Michelle Lindale brought suit against her former employer, Tokheim Corporation, claiming that it had discriminated against her on grounds of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec. sec.2000e et seq., and the Equal Pay Act, 29 U.S.C. § 206(d). She obtained a jury verdict for $100,000 in compensatory damages, and $250,000 (reduced by the judge to $200,000) in punitive damages, under Title VII, and some additional equitable relief, including $2,400 in double damages, under the Equal Pay Act. The Title VII violations involved constructive discharge and failure to promote.

In August of 1993, Tokheim, a manufacturer of gasoline pumps, hired the plaintiff's husband, Adam Lindale, a mechanical engineer working for a competitor of Tokheim's, as an "ME II." Tokheim has four pay grades for its mechanical engineers: ME I through ME IV, ME I being the lowest rank. Michelle Lindale had graduated in the same class from the same college, also with a bachelor's degree in mechanical engineering, as her husband, but she had gone to work for a company that did not make gasoline pumps. (She had, however, worked on the design of gasoline pumps as part of her college studies.) Shortly after Adam arrived at Tokheim, he noticed an opening for a mechanical engineer. Michelle applied and, in September of 1993, was hired as an ME I at a salary of $33,000. This was much higher than her existing salary but $1,356 less than her husband was receiving as an ME II. (After subsequent merit raises, two for her husband but only one for her, the gap between her pay and her husband's pay widened to $3,600.) Her superior at Tokheim assured her that with her qualifications and experience she would be promoted to an ME II within a year. She was the only female mechanical engineer employed by Tokheim.

Her work for Tokheim was excellent, and after a year her supervisor recommended that she be promoted to an ME II. Nothing happened. Around this time, two male engineers were hired. Tall, heavyset men (one was 6 foot 8 inches tall, and Michelle is only a 5–footer), they were boorish and kept logging her off the computer they shared with each other and her, thus interfering with her ability to work. She felt intimidated, and that they weren't treating her like a full professional. One of them took over her cubicle when she wasn't there, forcing her to move elsewhere. But her work continued to be excellent, and she became impatient for her promotion. In April 1995, when she had been employed at Tokheim in the lowly ME I slot for 19 months, she informed her then supervisor both that she was five weeks pregnant and that she still had not heard about her promotion. He promised to look into the matter but apparently never did. She said she planned to continue working after her baby was born and he remarked, "Well, isn't that going to be difficult for you to be both a mother and an engineer?"

In June of 1995, Adam Lindale resigned from Tokheim to return to his former employer. His resignation created an ME II vacancy, and Tokheim posted a notice of the job opening. Michelle promptly applied. She called her original supervisor, who was now in Scotland, and he faxed her superiors repeating his previous recommendation that she be promoted. Three weeks later, still not having received the promotion or an explanation for the delay, Michelle learned that Tokheim had placed an ad in the local newspaper for mechanical engineers, specifying

qualifications (such as at least three years' experience) that she had. After getting the impression that her husband's vacated ME II slot was the one to which the ad referred, and that she wouldn't be considered for the position, Michelle quit. This was the end of July; she had been employed by Tokheim for 22 months.

We must decide whether a reasonable jury could find that she was constructively discharged because the failure to promote her, in combination with the boorish behavior of the two men with whom she shared a computer, made it intolerable for her to continue working for Tokheim. Tokheim argues that a precondition to claiming constructive discharge is that the employee show that before quitting she had (unless in some imminent peril) sought legal redress for the condition that drove her to quit. Some cases say this (though none holds it), e.g., *Darnell v. Target Stores,* 16 F.3d 174, 177, 179 (7th Cir.1994); *Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 677 (7th Cir.1993); *Brooms v. Regal Tube Co.,* 881 F.2d 412, 423 (7th Cir.1989), but these dicta cannot be taken literally. For if they were, it would mean that in order to sue for constructive discharge, one would first have to bring a separate lawsuit challenging the condition that made one want to quit. Tokheim acknowledges as it must the exception (to any requirement of seeking legal redress) for cases of imminent peril—what the cases call "aggravated circumstances." But in making this concession it comes close to throwing in the towel, by conceding the existence of a class of constructive discharges in which the circumstances are not aggravated. If there is such a class, maybe the plaintiff is right that a failure to promote, though a lot less alarming than a threat to kill or to rape, might entitle an employee to quit and claim that she had been discharged.

The term "constructive discharge" refers to the situation in which an employee is not fired but quits, but in circumstances in which the working conditions have made remaining with this employer simply intolerable. E.g., *Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 886 (7th Cir.1998); *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010,

1015 (7th Cir.1997); *Poole v. Country Club of Columbus, Inc.,* 129 F.3d 551, 553 (11th Cir. 1997). Unless the employer is proved to be deliberately taking advantage of a known idiosyncratic vulnerability of the employee (like Winston's fear of rats in Orwell's *Nineteen Eighty–Four*) by altering the employee's working conditions in order to make the employee's life at work intolerable, the test for intolerable working conditions is whether a *reasonable* employee would have concluded that the conditions made remaining in the job unbearable. *Drake v. Minnesota Mining & Mfg. Co., supra,* 134 F.3d at 886–87; *Rabinovitz v. Pena,* 89 F.3d 482, 489 (7th Cir.1996); *Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 481 (1st Cir.1993).

In some situations, the standard of reasonableness will require the employee who wants to make a successful claim of constructive discharge to do something before walking off the job. The reason is not that there is a doctrine of exhaustion of remedies, which would, as we said, mean that the employee might have to sue twice to preserve his right to sue at all. The reason, rather, is that passivity in the face of working conditions alleged to be intolerable is often inconsistent with the allegation. See, e.g., *Brown v. Ameritech Corp.,* 128 F.3d 605, 608 (7th Cir. 1997); *Knowles v. Citicorp Mortgage, Inc.,* 142 F.3d 1082, 1086 (8th Cir.1998); *Tidwell v. Meyer's Bakeries, Inc.,* 93 F.3d 490 (8th Cir.1996); *Clowes v. Allegheny Valley Hospital,* 991 F.2d 1159, 1161–62 (3d Cir.1993); *Boze v. Branstetter,* 912 F.2d 801, 805 (5th Cir.1990). The significance of passivity is thus evidentiary. Suppose a worker has just been assigned to a job that he believes to be dangerous to his health, but the work force is unionized and he can file a grievance complaining about the assignment. His failure to do so may be compelling evidence that he, or a reasonable person in his situation, would not actually have found conditions in his new assignment unbearable. And likewise if, in a nonunionized shop, he is given an unreasonable order by his foreman and instead of complaining to the foreman's superior walks off the job and claims he was constructively discharged. Failure to exhaust may show that the employee didn't really consider his

working conditions intolerable or may deny the employer a reasonable opportunity to correct the situation without facing a lawsuit. But if neither condition is fulfilled, exhaustion is not required.

■ There was no constructive discharge in this case. But this was not because Michelle Lindale failed to complain—she complained plenty—and not because she failed before quitting to bring a lawsuit complaining about the failure to promote her, which would be an unreasonable condition to impose. It was because (setting the boors to one side for the moment) a reasonable employee would not have considered a failure to be promoted an event that made her working conditions intolerable. The Fifth Circuit was right in *Jurgens v. EEOC*, 903 F.2d 386, 392 (5th Cir.1990), to reject "the proposition that a simple discriminatory denial of promotion that cannot be reasonably construed as a career-ending action can alone create such embarrassment or humiliation that the denial comprises a constructive discharge." We are mindful of the qualification ("cannot be reasonably construed as a career-ending action"); if an employer has an "up or out" policy, as many law firms do, then refusal of up may mean out. See *Hopkins v. Price Waterhouse*, 825 F.2d 458, 472–73 (D.C.Cir. 1987), rev'd on other grounds, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 362–64 (D.C.1993). Yet even then, the employee would have to show why he had to quit immediately, before he found the other job; why, in other words, his duty to mitigate damages did not require him to remain.

In any event this is not an up-or-out case, and so we cannot see how a reasonable jury could find that the failure to promote Michelle Lindale made her working conditions intolerable. See, e.g., *Jurgens v. EEOC*, supra, 903 F.2d at 392–93; cf. *Bourque v. Powell Electrical Mfg. Co.*, 617 F.2d 61, 65 (5th Cir.1980). Indeed, her working conditions, tolerable before, were unchanged. The complaint, rather, is that she should have been paid more because—it is the heart of her claim under the Equal Pay Act—she was already doing the same work as an ME II, the work she *wanted* to be doing. There is

no indication that Tokheim was trying to get rid of her by giving her work she didn't want—no indication that the failure to promote her was the handwriting on the wall and she quit just ahead of the fall of the axe.

As for her boorish coworkers, there is no evidence that their boorishness had anything to do with her sex. That is not necessarily fatal to her claim of constructive discharge. Although you cannot complain about a constructive (or any other discharge) under discrimination law unless there is a causal relation between the discrimination and the discharge, e.g., *Rabinovitz v. Pena, supra*, 89 F.3d at 489; *Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1005–06 (7th Cir.1994), one can imagine a case in which the working conditions are already so poor, albeit for reasons unrelated to any invidious discrimination, that it requires less of a discriminatory "shove" to make a reasonable worker consider his working conditions intolerable. But we do not know of any such case; nor is this one, for the boorish behavior was an annoyance rather than an offense. Many workers have to put up with boorish colleagues.

■ The next question is whether the jury had enough evidence to justify a finding that the defendant's failure to promote the plaintiff was due to her being a woman. The evidence was sparse. It consisted of little more than the fact that although eminently qualified for promotion to the ME II rank, she was not promoted even after 22 months as an ME I, whereas men no more qualified than she were either hired directly into the ME II rank or promoted in much less time. Her husband was hired as an ME II after working on gasoline pumps for only one year, whereas she, after 22 months of working on them, was still an ME I. No more evidence than this was required to allow (though not compel) the jury to find that the plaintiff had indeed been discriminated against because of her sex. *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir.1997); *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1399–1400 (7th Cir.1997); *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1123–24 (7th Cir.1994). And it follows that if the jury disbelieved the testimony by her supervisors

as to why she was not promoted, it could render a verdict in her favor. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Shank v. Kelly–Springfield Tire Co.,* 128 F.3d 474, 478 (7th Cir.1997); *Maschka v. Genuine Parts Co.,* 122 F.3d 566, 571 (8th Cir.1997).

But this is on the assumption that the only evidence bearing on the claim of discrimination in promotion was the comparative experience of Michelle and her husband (and other men) and the exculpatory testimony of the employer's witnesses. There was more; and it was evidence that, because uncontested and uncontestable, the jury could not reasonably disbelieve. Some of this evidence whittled down the comparative evidence that is the cornerstone of the plaintiff's case. One man hired as an ME I was indeed promoted to an ME II after 18 months, but this was years before Michelle was hired. Another male ME I had to wait 30 months to be promoted, and no other males were promoted in fewer than 23 months. The plaintiff's husband complained about not being promoted in his two years with the company—it was one of his reasons for going back to his former employer. About all that is left standing of the comparative evidence is Michelle's less favorable treatment than her husband. But they were in different departments, they had been hired at different levels and so were not identically situated, and Michelle had the misfortune to have a rapid turnover of supervisors. Her first supervisor, Dinkel, her strongest supporter, was transferred to Scotland at just the time that he would have been pressing for her promotion in accordance with the assurances he had given her when she was hired. In the remainder of her time at Tokheim, she had three supervisors none of whom recommended promoting *any* of the mechanical engineers whom they supervised, all but one of whom were male; she was not singled out.

The comparison evidence is so weak in the circumstances that it cannot by itself support an inference of discrimination—and there is virtually nothing else. As we said, the bullies who logged Michelle off her computer were not shown to have had any gendered motivation; for all that appears they would have logged off any engineer whom they jointly outweighed, male or female. A woman employed in another of Tokheim's plants was (rather questionably) allowed to testify about sex discrimination against her before Michelle Lindale was hired. There were tiny bits of other evidence along this line. They add up to no more than a suspicion that Michelle's sex may have played a role in her failing to be promoted within 22 months, and suspicion is not enough to support a verdict.

■ We turn next to the claim under the Equal Pay Act. Superficially her claim is a strong one. There is plenty of evidence that she was doing the work described in Tokheim's job description of an ME II, yet she was paid less than the other ME II's and she was a woman and they were men. Q.E.D. But there is something obviously wrong with the analysis. What is left out is the causal relation between sex and pay. That is an element of the statute. Even if the man and woman are doing the same work for different pay, if the difference is due to a factor unrelated to gender, there is no violation. 29 U.S.C. § 206(d)(1)(iv); *Dey v. Colt Construction & Development Co.,* 28 F.3d 1446, 1462 (7th Cir.1994); *Fallon v. Illinois,* 882 F.2d 1206, 1211–12 (7th Cir.1989); *Buntin v. Breathitt County Board of Education,* 134 F.3d 796, 799 (6th Cir.1998). Consider a female assistant professor and a male full professor in the same department, doing the same amount of teaching and publishing-and perhaps the assistant professor is doing more of both, and doing it better. Yet she will almost certainly be paid less, because of her lower rank. The difference in sex would not make the difference in pay violate the Equal Pay Act.

■ This is the same kind of case; and so clear is this that, even though the burden of proof was on the employer, *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974), we do not think it was rational for the jury to reject the employer's defense. Compare *EEOC v. Delaware Dept. of Health & Social Services,* 865 F.2d 1408, 1414 (3d Cir.1989). All the ME II's, although they did the same kind of work, received different salaries, based on their experience with the firm. Michelle

Lindale had the least experience and received the lowest pay. There is no evidence that had she been male, she would have received higher pay. It is true that her husband had graduated from college at the same time as she. But she applied for a lower-paying position, as an ME I, in response to an ad that was not gender-specific. Had a man been hired for the ME I slot instead of her, he would have been paid no more than she even if his experience was more relevant to Tokheim's work than her husband's experience.

Since there is no proof that the Equal Pay Act was violated when she was hired at a lower salary than her husband, the question becomes whether the disparity ripened into a violation when she failed to catch up to her husband's salary. (In fact, as we noted. at the outset, the gap widened.) We think more evidence than the mere passage of time is required. Most large employers, even if their work force is not unionized, find it impracticable to match each employee's pay with the employee's work. Instead they use a pay grade system, like Tokheim's. Each employee within a given grade receives the same or a similar salary; there are salary jumps between grades rather than a smooth progression; and promotion from grade to grade may be based in part on seniority, in part on credentials, and in part on competition in the labor market. In such a situation, it is inevitable that some workers will receive different pay for the same work, and the fact that the lower-paid worker is a woman is so likely to reflect the operation of accidental, noninvidious factors that we do not think an inference of violation of the Equal Pay Act can be drawn from the mere difference. If the woman were hired first at the higher wage and the man later at a lower wage yet he zoomed past her even though their work was identical in kind and quality, this would be enough evidence of a violation to carry the case into jury-land. But a mere failure of catch up is not by itself enough evidence.

No doubt it could be argued that Tokheim's pay-grade system was so "loose," so full of discretionary elements, as not to provide a safe harbor. Cf. *EEOC v. Delaware Dept. of Health & Social Services, supra,* 865

F.2d at 1414–16; *Maxwell v. City of Tucson,* 803 F.2d 444, 447–48 (9th Cir.1986). But we do not say it does provide a safe harbor. If Tokheim had hired a man at ME I at about the same time it hired Michelle Lindale, and made him an ME II a week later, it would be no defense to her equal-pay claim that the man was promoted to a different grade. Our point is only that given a pay-grade system, it cannot be assumed that a failure of a later-hired employee to catch up, because she must climb the rungs of a pay-grade ladder, is a product of discrimination.

We conclude that there was a failure of proof on all three of the plaintiff's claims and therefore that the defendant is entitled to judgment as a matter of law. But for completeness we add that the award of damages for the Title VII violations could not stand in any event. There was, to begin at the end, no basis for awarding punitive damages, because the plaintiff made no effort to satisfy the statutory standard, which requires proof that the defendant was either malicious or recklessly indifferent to the plaintiff's rights. 42 U.S.C. § 1981a(b)(1); *Tincher v. Wal–Mart Stores, Inc.,* 118 F.3d 1125, 1132 (7th Cir.1997); *Emmel v. Coca–Cola Bottling Co.,* 95 F.3d 627, 636 (7th Cir.1996); *Harris v. L & L Wings, Inc.,* 132 F.3d 978, 982–83 (4th Cir.1997). In most cases of "intentional" discrimination, the intent is not that of the employer in any realistic sense, but that of middle-level supervisors whom an employer can but imperfectly monitor and control. In such a case—the garden-variety disparate-treatment case with no circumstances of aggravation such as the involvement of higher management or a pattern of flouting the law, *Emmel v. Coca–Cola Bottling Co., supra,* 95 F.3d at 636–38; *Harris v. L & L Wings, Inc., supra,* 132 F.3d at 983–84—punitive damages may not be awarded. *Tincher v. Wal–Mart Stores, Inc., supra,* 118 F.3d at 1132–33; *Emmel v. Coca–Cola Bottling Co., supra,* 95 F.3d at 636; *Ngo v. Reno Hilton Resort Corp.,* 140 F.3d 1299, 1303–05 (9th Cir.1998).

The award of compensatory damages also could not have stood even if a violation of Title VII had been proved. One-quarter of the $100,000 award was for distress caused by the constructive discharge. Even if it had

been an outright discharge, this amount of money, in the absence of any evidence of significant emotional injury or other circumstances of aggravation, would have been excessive by at least a factor of two. *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1228–30 (7th Cir.1995). Most of the rest of the award was for a conjectured reduction in the present value of the plaintiff's future earnings as a result of the failure to promote her. It is possible that a failure to win promotion could affect an employee's future earnings in other jobs, either because the failure was taken by future employers as a signal of inadequacy or (a related point) because earnings in a subsequent job are often a function in part of earnings in a previous job. But as with other items of damages, more than conjecture is required; proof is required and, in contrast to the situation in *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 952–54 (7th Cir.1998), was not presented. *Gunby v. Pennsylvania Electric Co.*, 840 F.2d 1108, 1121–22 (3d Cir.1988); *Rodgers v. Fisher Body Division*, 739 F.2d 1102, 1106–08 (6th Cir.1984).

The judgment for the plaintiff is reversed with directions to enter judgment for the defendant and dismiss the suit with prejudice.

Reversed.