In the
United States Court of Appeals
For the Seventh Circuit

No. 00-4065

Equal Employment Opportunity Commission,

Plaintiff-Appellant,

v.

University of Chicago Hospitals,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 6109--Blanche M. Manning, Judge.

Argued May 16, 2001--Decided January 2, 2002


   Before Harlington Wood, Jr., Coffey, and
Williams, Circuit Judges.

   Williams, Circuit Judge.  The Equal
Employment Opportunity Commission sued
the University of Chicago Hospitals
alleging that the Chicago Hospitals had
unlawfully discriminated on the basis of
religion when it constructively
discharged Victoria Leyva. The district
court granted summary judgment to the
Chicago Hospitals, finding that the EEOC
had not demonstrated constructive
discharge nor any religious
discrimination, only voluntary
resignation. The EEOC appeals seeking
reversal of that decision, so that it can
move forward with its case. We believe
that the EEOC has adequately demonstrated
constructive discharge on the basis of
religious discrimination, as alleged, so
as to defeat summary judgment and proceed
to trial. Therefore, we reverse.

I.   BACKGROUND

A.   The Facts

   Victoria Leyva is an Evangelical
Christian Baptist. Leyva was a recruiter
in the University of Chicago Hospitals'
("Chicago Hospitals") Employment
Department between December 1990 and July
1992, and before JoAnn Shaw arrived, she
had received high marks from her
immediate supervisor, Employment

Department Manager William Thornton. For instance, in a June 30, 1991 annual performance evaluation, Thornton rated her a 3+ overall on a scale of 1 to 5 (5 being the highest), where 3 was defined as performing at "levels which should be expected and considered acceptable" and as "doing a good job." He praised her abilities, describing her as an "excellent" recruiter and team member who achieved "excellent results and [had] gotten many compliments from her departments."

JoAnn Shaw is a Roman Catholic. In May 1991, she was hired by the Chicago Hospitals as Associate Director of the Chicago Hospitals and Director of Human Resources, which included the Employment Department. One of her explicit tasks was to improve the human resources function. So with her arrival came changes, particularly in evaluations of Leyva's performance. Leyva believed that this change was because of her evangelical religious beliefs.

Before she officially began her duties, Shaw met with Leyva in Leyva's office,/1 where she noticed a calendar entitled "Treasures of Inspiration: A Woman's Guide to Daily Living" and a five-inch clock inscribed with "Armitage Baptist Church, Chicago-Illinois. Pastor Charles Lyon." on Leyva's desk. Concerned that the items were too "religious in nature," Shaw directed Thornton to have Leyva remove the items. Thornton told Leyva to remove the items because they were "too religious, [and] too denominational." Leyva removed them. Shaw also attached a handwritten Post-It Note to Thornton's performance appraisal of Leyva, which stated "Baptist church referrals off desk."

Before Shaw was hired, Thornton and Leyva had recruited employees from churches, but after she arrived, Shaw issued a directive to all employees to stop recruiting at churches or church job fairs. This directive was a recurrent source of tension between Shaw and Leyva, as Shaw believed Leyva continued to recruit from her church. According to the Chicago Hospitals, however, the problems with Leyva were much more than recruiting from churches. Some of her supervisors believed she recruited exclusively from her church and hired unqualified people.

In October 1991, Thornton resigned (at Shaw's request), and he was replaced by Ralph Borkowicz. As the new middleman between Shaw and Leyva, Borkowicz reiterated Shaw's directive to Leyva not to recruit at church job fairs, and he told her that Shaw thought she was an "uncreative recruiter." Leyva denied recruiting at churches since the directive. Borkowicz and Shaw also carpooled together, and Leyva was a source of common discussion. According to Borkowicz, Shaw made it "very clear that she had a problem with [Leyva's] religious beliefs and bringing religion into the workplace," calling her a "religious fanatic." In addition, Shaw repeatedly stated that she wanted Leyva fired, which Borkowicz believed was because of Leyva's religion.

In early May 1992, Shaw told Borkowicz that "she was not happy--this wasn't working out" and that she wanted him to fire Leyva. Borkowicz responded that he "didn't see any reason for terminating [Leyva], and [that Shaw] needed to do what she needed to do." A couple weeks later, Shaw told Borkowicz that she was going to start taking steps to remove him from his position because he refused to fire Leyva. She terminated him on May 21, 1992, and on that same day, according to Leyva, Borkowicz told her that he was terminated because he refused to fire her.

Leyva also testified that on June 6, 1992, Borkowicz warned her that Shaw said she "wanted [her] out, but that she was going to make it very hard for [her] so [she] would quit, and [she] would not be able to collect unemployment." Borkowicz told her that Shaw was "setting [her] up so that [she] would quit, gathering complaints and gathering whatever she could." Borkowicz told Leyva to "watch [her] back." In addition, he informed her of an example of Shaw's hostility toward her. Leyva had applied for a grant from the Chicago Hospitals' outreach program to her church for its tutoring program in the spring of 1992. In early May 1992, the employee advisory committee awarded Leyva's church $500 (which Shaw's assistant Roger Bottorff had lobbied for her to receive). Although Bottorff prepared a May 8, 1992 letter of congratulations signed by Shaw that

notified Leyva that the $500 check could be picked up in a few days, at the time of her June 6th conversation with Borkowicz, Leyva had not received the letter. She did not know it existed. She stated that Borkowicz said to her, "the awards had been made, the checks had been cut and [Shaw] was holding it because [she was] a Bible thumper and a goody two-shoes, and [Shaw] was gonna make [her] sweat."

Borkowicz was replaced by Bottorff (Shaw's assistant and a project manager). Like Borkowicz, Bottorff told Leyva that Shaw did not want her to recruit at church job fairs, which Leyva again denied. He further instructed her (twice) not to hire "church people, the needy, or [her] friends." In June, Bottorff evaluated Leyva for her annual evaluation, giving her a rating of 2 overall, which is defined as performance "at or slightly above the minimum requirements for the job" and "improvements are needed." During her evaluation review, he implied that Leyva could be terminated if she did not improve. In preparing his evaluation, Bottorff did not ask Borkowicz for his input, though Bottorff had only been in his position for a month. Instead, his evaluation was based on Shaw's comments and his observations over that month.

In June, the Chicago Hospitals hired Lynda Cartwright as a recruiter. She had the same job title as Leyva and assumed part of her responsibilities. In July, Leyva left for vacation. Bottorff called her during that vacation to ask her about missing applicant test scores, but Leyva did not know their location. Bottorff told her that "this is the last straw, and that he told [her] three times not to refer church friends, and that [they] would talk about it when [she] returned," and that she should be "prepared."

Leyva talked to Borkowicz before she returned, and according to Borkowicz, she told him that "it looked like she was going to get fired." Leyva prepared her resignation letter, which she had ready when she returned to work. When she arrived, she found her desk packed up, her office used for storage, and boxes piled up. Bottorff then entered her office and said that they should talk. After briefly talking with Bottorff,

Leyva resigned. In her resignation letter, Leyva stated that she resigned because she could not "continue employment at the hospital and obey" the directive "not to refer 'church people, church friends or the needy' into entry level position[s]."

B.  District Court Proceeding

Leyva filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), and the EEOC in turn sued the Chicago Hospitals in the United States District Court for the Northern District of Illinois, under Titles I and VII of the Civil Rights Acts of 1991 and 1964 respectively. The EEOC alleged that the Chicago Hospitals unlawfully discriminated against Leyva when it constructively discharged her on the basis of her religion./2 The Chicago Hospitals moved for summary judgment.

After initially struggling with the appropriate analysis to apply to this case (in part because the parties disagreed), the district court decided that this constructive discharge case best fit the hostile-work-environment-plus category and proceeded to analyze it under that rubric. The district court found that the harassment the EEOC had alleged to support its constructive discharge case failed to demonstrate an intolerable work environment that would have caused a reasonable person to resign, and therefore failed to demonstrate constructive discharge. Moreover, the district court found that none of the alleged harassment was based on religion. Accordingly, the district court granted summary judgment to the Chicago Hospitals. The EEOC now appeals.

II.  ANALYSIS

The issue presented in this appeal is whether the EEOC has sufficiently demonstrated constructive discharge on the basis of religious discrimination so as to survive summary judgment and proceed to trial. To answer this question, we must consider whether the EEOC has shown that (1) Leyva was constructively discharged by the Chicago Hospitals, and (2) the constructive discharge was motivated by religious discrimination. See Simpson v. Borg-Warner Auto., Inc., 196 F.3d 873, 877

(7th Cir. 1999). We believe the EEOC has met its burden and that summary judgment was inappropriate for the reasons that follow./3

In deciding this case, we review the decision of the district court, granting grant summary judgment on the question of constructive discharge, de novo. See, e.g., Grube v. Lau Indus., Inc., 257 F.3d 723, 727 (7th Cir. 2001). Furthermore, as is proper for summary judgment motions, we view the evidence in the light most favorable to the EEOC (the nonmoving party) and make all reasonable, justifiable inferences in its favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

A.   Constructive Discharge

Constructive discharge, like actual discharge, is a materially adverse employment action. See, e.g., Fitzgerald v. Henderson, 251 F.3d 345, 357-58 (2d Cir. 2001). But to demonstrate constructive discharge, the plaintiff must show that she was forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable. See, e.g., Lindale v. Tokheim Corp., 145 F.3d 953, 955 (7th Cir. 1998). We are ordinarily faced with a situation in which the employee only alleges that she resigned because of discriminatory harassment, and in such cases, we require the plaintiff to demonstrate a discriminatory work environment "even more egregious than the high standard for hostile work environment." Tutman v. WBBM-TV, Inc., 209 F.3d 1044, 1050 (7th Cir. 2000), cert. denied, 531 U.S. 1078 (2001).

But that is not the only method of demonstrating constructive discharge. When an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge./4 See generally Bragg v. Navistar Int'l Transp. Corp., 164 F.3d 373, 377 (7th Cir. 1998) ("Constructive discharge exists to give Title VII protection to a plaintiff who decides to quit rather than wait around to be fired."); see also, e.g., Burks v. Oklahoma Publ'g Co., 81 F.3d 975, 978 (10th Cir. 1996); Lopez v. S.B. Thomas,

Inc., 831 F.2d 1184, 1188-89 (2d Cir. 1987); cf. Hunt v. City of Markham, Illinois, 219 F.3d 649, 655 (7th Cir. 2000) ("A person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self- respect, and therefore intolerable."); Henn v. Nat'l Geographic Soc'y, 819 F.2d 824, 829-30 (7th Cir. 1987).

In this case, the EEOC has met its burden of showing constructive discharge. It has sufficiently demonstrated that a reasonable employee standing in Leyva's shoes would have believed that had she not resigned, she would have been terminated. Most significantly, when Leyva arrived at work, her belongings were packed and her office was being used for storage. That evidence is only underscored by the other evidence pointing to her imminent termination, specifically Shaw's removal of Thornton, then Borkowicz, combined with Borkowicz's warning of Shaw's intent, plan, and attempt to terminate her as well. Moreover, the EEOC presented evidence that with Shaw's arrival came significant changes in Leyva's evaluations, repeated accusations of her failure to follow directives, and a general environment in which Shaw was hostile to Leyva's religious beliefs. To complete the picture, Bottorff called Leyva and stated that her failure to remember the location of several test scores was "the last straw." This environment, in which her employer made reasonably clear to her that she had reached the end of the line--where "the handwriting [was] on the wall" and the axe was about to fall, Lindale, 145 F.3d at 956--could have indeed been to a reasonable employee unbearable.

The Chicago Hospitals argues that the packed-up office "event could not have contributed to her reasons for quitting," citing comparatively to Mason v. Southern Ill. Univ., 233 F.3d 1036, 1046 (7th Cir. 2000), because it occurred after she prepared her resignation letter, and that "nothing that happened to Leyva even remotely suggested an imminent discharge." We are perplexed at these assertions. Although Leyva had prepared

her letter of resignation before arriving at work that day, her decision to submit that letter could have surely been based on seeing her belongings packed up and her office being used for storage--a sight that signaled to Leyva that her superiors were set to do what they had intimated and attempted to do earlier./5 The other conduct by Shaw and by Bottorff point rather convincingly, we believe, to the conclusion that Leyva's termination was imminent. It is hard to believe much else when a supervisor states, "this is the last straw."

The Chicago Hospitals' arguments that the EEOC has relied on inadmissable hearsay evidence are also unpersuasive. For example, the Chicago Hospitals argues that Borkowicz's statement that Leyva told him that "it looked like she was going to get fired" is inadmissable hearsay. But the statement was not used for the truth of the matter asserted (i.e., that it indeed did look like Leyva would be fired), but to show Leyva's state of mind at the time she returned to work. Likewise, Leyva's recital of Borkowicz's statements of what Shaw said were used as state of mind evidence--to demonstrate whether Leyva reasonably believed her termination was imminent. Such statements are expressly excluded by Federal Rule of Evidence 803(3) from the hearsay rule. As another example, the Chicago Hospitals argues that Leyva's statement that Borkowicz told her to "watch [her] back" is hearsay. It is not. That statement bears on no issue of fact, to which it is asserting a truth. Even if we could conceive of some hearsay violation, requiring the exclusion of certain evidence from consideration, it would not change our conclusion based on the non-hearsay evidence in this case.

B.  On the Basis of Religious Discrimination

After demonstrating constructive discharge, the plaintiff must show that the constructive discharge was motivated by discriminatory intent--in this case, religiously discriminatory intent. See Simpson, 196 F.3d at 877. But contrary to the Chicago Hospitals' assertions, it is not necessary that the incidents that surround the constructive discharge themselves constitute actionable

religious discrimination; instead our focus is whether those incidents, and other supporting evidence, could support the reasonable inference that the alleged constructive discharge was based on religious discrimination.

Here again, we believe the EEOC made its case. Borkowicz testified that Shaw had called Leyva a "religious fanatic" and had problems with her "religious beliefs and bringing religion into the workplace." Furthermore, he testified that Shaw repeatedly stated that she wanted Leyva fired, which he believed was because of Leyva's religion, attempted to have him fire Leyva, and fired him when he refused. These statements and actions occurred within two months of Leyva's constructive discharge. Adding this to the other alleged conduct (e.g., the calender and clock removal, the changes in job evaluation, the repeated accusations of hiring at churches, etc.), we are satisfied that the evidence is sufficient to defeat summary judgment. Compare Hunt, 219 F.3d at 651-53.

III.  CONCLUSION

For the foregoing reasons, the judgment of the district court is Reversed and the case is Remanded.

FOOTNOTES

/1 It was at this initial meeting that Leyva disclosed her evangelical religious beliefs to Shaw.

/2 The EEOC's other claims of hostile work environment and failure to accommodate are not at issue in this appeal.

/3 The Chicago Hospitals mentions the prima facie case and framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). However, the EEOC alleges direct evidence of discrimination, making that framework inapposite. Even if the McDonnell Douglas framework were applicable, the Chicago Hospitals has proffered a legitimate, nondiscriminatory reason for its actions, which would effectively bring that framework to an end, and the EEOC has elected to meet its burden of proving intentional discrimination directly, rather than by pretext.

/4 The Chicago Hospitals has incorrectly treated this case as if it is and could only be a hostile-work-environment-plus case, and as a result, most of its analysis is irrelevant to the questions we address. It also argued that the immi-

nent-discharge argument is waived, because it was not presented to the district court. We disagree. The issue was adequately presented to the district court, and therefore not waived.

/5 The Chicago Hospitals also argues that Leyva's statement in her resignation letter that she resigned because she could not obey the directive not to refer church people, church friends, or the needy into entry level positions is evidence against her argument that she believed that she would be terminated (on the basis of her religious beliefs). That is, of course, now an argument for the jury.