NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0448n.06
Case No. 19-1691

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CHARLES FUNK, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | Jul 31, 2020 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| CITY OF LANSING, MICHIGAN; | ) | MICHIGAN |
| MICHAEL A. YANKOWSKI, in his | ) | |
| individual and official capacity | ) | |
| | ) | |
| Defendants-Appellees. | | |
| _____/ | | |

Before: MERRITT, GUY, and STRANCH, Circuit Judges

**MERRITT, Circuit Judge.** Plaintiff Charles Funk is an African American man who worked for Defendant City of Lansing, Michigan's Police Department from 1997 until his resignation in 2016. Funk brings a failure to promote claim and a constructive discharge claim under Title VII. He also alleges retaliation claims in violation of the First Amendment and Title VII. The district court granted summary judgment to Defendant on all claims. For the reasons below, we agree with the district court with respect to Funk's failure to promote claim, constructive discharge claim, and First Amendment retaliation claim. However, we find that the district court improperly analyzed Funk's Title VII retaliation claim.

**I.**

Funk began serving as a Sergeant in September 2012, and began working as a jail sergeant April 2013. Funk eventually transferred back to road patrol, where he served until his resignation.

Captain Darin Southworth served as a Captain from 2014 until he retired in 2018, and, as Captain, reviewed disciplinary investigations by Internal Affairs and made disciplinary recommendations to the Defendant Chief of Police, Michael Yankowski. Internal Affairs is the Department's office that investigates complaints filed by citizens or employees. A sergeant and lieutenant head the office. Internal Affairs investigates the claim and determines its merits, and issues a report with guidelines based on the Department's disciplinary algorithm, the "matrix." The immediate supervisor of the alleged wrongdoer can approve or alter the recommended discipline. The action then goes to the Chief of Police for final approval.

As Chief of Police, Chief Yankowski was the final decision-maker for disciplinary and promotion matters and was Chief of Police at all times relevant to this appeal. Some of Funk's conversations with Chief Yankowski are the basis of Funk's failure to promote and constructive discharge claims.

Amid public controversies surrounding police treatment and African Americans, Funk expressed concerns to Chief Yankowski about such issues Funk noticed within the Department. Funk emailed Chief Yankowski in December 2014, January 2015, and August 2015, explaining that Funk needed to speak to him. Funk and Chief Yankowski spoke in person shortly after each email, and Funk mentioned two different incidents within the Department in which a white officer arrested an African American citizen, but the arrest reports did not contain the required elements for the alleged crimes. During this time, Funk was a jail sergeant and was responsible for

reviewing arrest and intake reports submitted by officers. Funk asserts that these conversations prevented him from being promoted about eight months later.

In April 2016, Funk applied for a promotion to Lieutenant along with then-Sergeants Rodney Anderson (African American) and Rob Backus (white).[1] The promotion process involved a variety of factors. Among other things, an outside vendor conducted a written test, interviewed the candidates, and provided the results to the Department. The top five scores made up the "A Band," followed by the next five highest scores, the "B Band." The A Band was to be exhausted before considering any candidate from the B Band. Funk was in the A Band and had one of the highest scores for the written portion. Those scores were only one component of the promotion process. Funk understood that Chief Yankowski was permitted to consider many other factors in deciding whom to promote. The Department promoted both Anderson and Backus but did not promote Funk.

Funk spoke to Chief Yankowski shortly after he was denied the promotion. Chief Yankowski told Funk that he had an opportunity for a promotion in the near future. He also stated later that if Funk had not resigned, he would have "had the opportunity to get promoted" as Funk was the only remaining candidate in the A Band. On April 12, 2016, Funk filed a complaint with Human Resources regarding his promotion denial, alleging racial discrimination.[2]

In 2016, Funk received a spate of Internal Affairs complaints. On April 14, 2016, Funk received an Internal Affairs complaint for three incidents during one shift for failing to properly respond to a request to restrain an inmate. Internal Affairs recommended a ten-day suspension,

---

[1] Because most of Funk's claims are subject to the framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which requires Funk to show that Defendant treated him differently than a similarly situated employee of a non-protected class, we focus on Backus, not Anderson.

[2] Funk filed a grievance on April 6, 2016, which was denied in arbitration. Funk also filed a complaint with the Equal Employment Opportunity Commission on September 7, 2016.

but Captain Southworth reduced the suspension to three days. On May 1, 2016, Funk received a written reprimand for a March 15, 2016 incident, for failing to secure a firearm while working in the jail. On the same day, he also received a counseling notation for failing to complete routine shift paperwork from March 14-20, 2016. Funk received another Internal Affairs complaint on July 3, 2016, for failing to appear for an overtime shift and for failing to notify anyone of his absence. He received a three-day suspension for this offense. Funk claims that the Department only called his work phone, which he was not required to have off duty, and that the Department never called his home phone, which would have happened for anyone else.

Funk had not received any disciplinary actions in 2014 or 2015. Captain Southworth said that it was uncommon for an officer to have a pattern of "back-to-back" disciplinary actions as Funk did in 2016 and also that he did not observe Funk's performance objectively worsen around that time. Southworth explained, too, that he was never asked to "keep a closer eye" on Funk and stated that the pattern of disciplinary actions towards Funk "just so happened."

On August 8, 2016, Funk was on duty in a marked Lansing Police SUV at an intersection in Lansing. While Funk was turning, his vehicle made contact with a wheelchair occupied by Paul Palmer. Later that same day, Palmer called the Department and filed a complaint. Palmer's complaint was referred to Internal Affairs, and at this time the Department placed Funk on paid administrative leave. The Department hired a law firm to investigate the complaint, and the Michigan State Police conducted an investigation as well. Palmer's and Funk's versions of events contradict one another, and Defendant claims that Funk was untruthful during the investigation. The exact events surrounding the Palmer incident, however, are not material to our analysis.

Internal Affairs concluded that Funk violated Michigan Motor Vehicle Code §257.612(4) and Department policies regarding truthfulness, conformance to laws, accountability,

insubordination, and violation of rules. [3] The Michigan State Police charged Funk with violating the statute, and a jury convicted him. The disciplinary actions surrounding this incident eventually led to Funk's resignation.

Captain Southworth reviewed the Internal Affairs investigation and recommended termination. The Department scheduled a pre-determination hearing for Funk on September 15, 2016. Prior to the hearing, Funk and Chief Yankowski each spoke separately with Attorney Anthony Lett, who represented the police union. Chief Yankowski told Attorney Lett that the Department was reviewing the matter and evaluating some "pretty significant sustained charges at the predetermination hearing." Attorney Lett asked Chief Yankowski what he "was going to do with" Funk, and Chief Yankowski responded that he had not "made that determination yet" but indicated it was a "worst case scenario." According to Funk, Attorney Lett then told him that he could either go to the hearing and be terminated, or resign.

Funk resigned on September 12, 2016, Chief Yankowski received and signed Funk's letter of resignation on September 13, 2016. Chief Yankowski received Captain Southworth's recommendation for dismissal on September 13 as well, but never signed off on it because there was no predetermination hearing due to Funk's resignation. Funk stated that he never saw any document regarding his discipline before resigning.

Funk filed his complaint on June 7, 2017, lodging a host of state and federal discrimination and retaliation claims.

On December 28, 2018, Defendants filed a motion for summary judgment. The district court granted Defendants' motion for summary judgment on May 24, 2019. This appeal followed.

---

[3] Truthfulness, accountability, and insubordination violations are Class D offenses, the most extreme offenses per the matrix. "Insubordination" is "disrespect toward a supervisor, open defiance, or the refusal to obey any lawful order or directive of a supervisor in a timely and satisfactory manner."

## II.

We review de novo a district court's grant of summary judgment. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019). "Summary judgment is proper where the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(a)) (internal quotation marks omitted). "In considering a summary judgment motion, this Court must consider the evidence in the light most favorable to the non-moving part[y], drawing all justifiable inferences in [his] favor." *Id.* (internal quotation marks omitted). The key question "is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving part[y] should prevail as a matter of law." *Id.*

Funk brings two racial discrimination claims under Title VII: a failure to promote claim and a termination claim by way of constructive discharge claim. He also asserts retaliation claims under the First Amendment and Title VII.

### A. Funk's Race Discrimination Claims

#### i. Failure to Promote

Funk first alleges that Defendants denied Funk promotion on account of his race, in violation of Title VII.[4] A plaintiff may prove discrimination by direct evidence or use indirect evidence under the three-part burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* (citing *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 1998)).

---

[4] Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1).

The *McDonnell Douglas* framework first requires that the plaintiff make out a *prima facie* case of discrimination by demonstrating he or she (1) "is a member of a protected class;" (2) "was qualified for [the] job;" (3) "suffered an adverse employment decision;" and (4) "was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Id.* at 606–07. If the plaintiff establishes a *prima facie* case, "the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Id.* at 607. If the defendant does so, "the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination." *Id.*

Funk establishes a *prima facie* case for his failure to promote claim. The parties do not dispute that, Funk, an African American, is a member of a protected class. Nor do they dispute Funk's qualifications for the promotion to Lieutenant and that Defendant denied Funk that promotion. "For the purposes of Title VII, a failure to promote is an adverse employment action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000) (citing *Hale v. Cuyahoga Cty. Welfare Dep't*, 891 F.2d 604, 606 (6th Cir. 1989)). Defendant also treated Funk differently than a similarly situated employee of a non-protected class: Backus, a Caucasian, was promoted. Funk has thus established a *prima facie* case.

Defendant has articulated a legitimate, non-discriminatory reason for not promoting Funk to Lieutenant. Chief Yankowski explained in his deposition that he did not promote Funk for a variety of reasons. Chief Yankowski considered Funk's disciplinary history, recommendations from captains, and community outreach, among other things. He explained that Funk had 52 total complaints (22 of which were formal), 3 written reprimands, 3 counseling notations, and 1 suspension. Funk had three awards. During this time Funk also had three open and pending Internal Affairs investigations. Chief Yankowski also stated that Funk "had not volunteered to do

anything extra within the organization" and that, on the whole, Funk's "body of work" was not "more deserving" than Backus's.

Chief Yankowski stated that Backus, however, "was involved with community outreach" and volunteered for the Police Benevolent Association, was a union representative, started certain crime prevention and crime strategy programs within the organization," and "volunteered to write grants." Backus "was [also] highly regarded inside the organization and outside." Additionally, Backus had 23 total complaints (12 of which were formal), 1 counseling notation, 0 written reprimands, and 2 suspensions. Backus had 34 awards. Funk must therefore show by a preponderance of the evidence that Defendant's reasons were a pretext for discrimination.

A plaintiff can show pretext in three ways: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Redlin*, 921 F.3d at 612.

Funk suggests that the reasons given by Defendants were false. The promotional review forms, however, show that Funk had a more extensive disciplinary history at the time of the promotion than did Backus. Funk argues that the violent crime initiative in which Backus was engaged was not "community outreach" but a work assignment, but Funk does not provide any support for this proposition beyond his own assertion. Moreover, Backus' promotional review form lists numerous activities under the "community outreach" section, and Funk does not claim that he engaged in any community outreach at all. So, even if some of the projects in which Backus was involved were in fact not community outreach, Backus still was involved in more community outreach activities than Funk. Funk cannot show that Defendant's reasons were false.

Nor can Funk show pretext with evidence that Defendants' proffered reasons did not actually motivate its decision. Funk does not provide any evidence to contradict Chief

Yankowski's testimony for promoting Backus instead of Funk. Indeed, Funk's testimony about the explanation Chief Yankowski provided him is largely consistent with the reasons Chief Yankowski discussed in his own deposition. Defendants' explanation for promoting Backus instead of Funk thus consists of legitimate, non-discriminatory reasons. To the extent that Funk argues that his HR complaint and the Palmer incident provide evidence of pretext, those events had not yet occurred at the time of Funk's promotion denial.

Finally, Funk cannot show pretext on the basis that Defendant provided insufficient reasons for not promoting him. Funk maintains that the promotion process consisted of some subjective components, and that *White* "recognized that subjective components of 'reasons' can be rejected by juries[.]" In *White*, the subjective components of the promotion process the court questioned involved interviews of candidates performed by employees of the same organization who said that the plaintiff was "extremely aggressive" in the interviews. *White*, 533 F.3d at 386–87, 394–95. Funk does not assert that the interview during his promotion process was the subjective component, however. He instead argues that the "community outreach" component was subjective. But whether an employee engaged in community outreach is an objective consideration. Moreover, there is evidence that Backus was involved with community outreach, was a union representative, volunteered to write grants, and received 34 awards for his work in the Department. And Funk admitted that he understood Chief Yankowski could consider other factors than test scores. Funk has thus failed to show that Defendants' reasons for denying Funk promotion were pretext for racial discrimination.

  *ii.*  *Constructive Discharge*

Funk asserts a termination claim under Title VII by way of a constructive discharge. Funk relies on circumstantial evidence, so the *McDonnell Douglas* framework applies. *See Laster v.*

*City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014). The parties do not dispute the first two elements of Funk's *prima facie* case—Funk's membership of a protected class and his qualifications for Lieutenant. But Funk cannot establish a *prima facie* case for his constructive discharge claim because here, unlike his failure to promote claim, he cannot show that he suffered an adverse employment action.

A constructive discharge is an adverse employment action for purposes of Title VII. *Id.* (citing *Kocsis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)). "A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Id.* (internal quotation marks omitted). For a constructive discharge claim, a plaintiff must show that (1) "the employer deliberately created intolerable working conditions, as perceived by a reasonable person," and (2) "the employer did so with the intention of forcing the employee to quit." *Id.* at 727–28 (citing *Saroli v. Automation and Modular Components, Inc.*, 405 F.3d 446 (6th Cir. 2005); *Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001)).

*Laster* is instructive here. There, one of the defendant's employees was "given a direct order to immediately report any wrongdoing" by the plaintiff. *Id.* at 722. But the court held that the plaintiff was not constructively discharged because he offered no evidence that the defendant took those measures with "with the specific intention" of forcing him to quit. *Id.* at 728. Here, while Captain Southworth said that Funk's 2016 disciplinary pattern was unusual, he was never asked to "keep a closer eye" on Funk. Chief Yankowski also stated that, had Funk not resigned, Funk would have "had the opportunity to get promoted." Moreover, Funk "ultimately resigned not because of the intolerable working conditions," but because, based on his conversations with Attorney Lett, he thought he would be terminated. *Id.* As such, Funk cannot show that Defendant

"*deliberately* created intolerable working conditions with the *intention* of forcing [him] to quit." *Id.*

*Laster* also recognized that, in addition to a traditional constructive discharge claim alleging discriminatory harassment, "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that []he will be terminated, and the plaintiff employee resigns, the employer's conduct may [also] amount to constructive discharge." *Id.* (citing *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331–32 (7th Cir. 2002)) (emphasis omitted). "In other words, constructive discharge occurs where, based on an employer's actions, 'the handwriting was on the wall and the axe was about to fall.'" *Id.* (quoting *Univ. of Chicago Hosps.*, 276 F.3d at 332).

Defendants did not act in a manner so as to have communicated to Funk that he would likely be terminated. "[I]t is undisputed that [Funk] was not directly told that he would be terminated at the pre-determination hearing." *See id.* at 728–29. Although Attorney Lett told Funk that he would likely be terminated at the hearing, "there is nothing in the record to indicate that [Defendant] actually communicated as much to [Funk]." *Id.* at 729. Funk resigned because of what Attorney Lett communicated to him, not Defendants. And Funk never saw any documentation regarding his discipline before resigning. Funk cannot establish that he was constructively discharged.

## C. **Funk's Retaliation Claims**

Funk also brings two retaliation claims. Funk brings his first retaliation claim under 42 U.S.C. § 1983 and the First Amendment. His second alleges Title VII retaliation.

>        *i.*        *First Amendment Retaliation*

A *prima facie* case of First Amendment retaliation requires a public employee to show that:

> (1) he engaged in constitutionally protected speech or conduct; (2) the employer took an adverse action against him that would deter an ordinary person from engaging in that conduct; and (3) the protected speech was a substantial or motivating factor in the adverse action.

*Laster*, 746 F.3d at 733 (citing *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006); *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004)). Funk fails to satisfy the first element.

For a public employee to have a cause of action under the First Amendment, the speech must be of public concern and must be spoken as a citizen, meaning that the speech cannot be "ordinarily within the scope of an employee's duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014) ("The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."); *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (stating that an "employee has no First Amendment cause of action" if the employee did not speak "as a citizen on a matter of public concern") (citing *Connick v. Meyers*, 461 U.S. 138, 147 (1983)).

The parties do not dispute that Funk's conversations with Chief Yankowski about potential racial discrimination within the Department involved matters of public concern. *See Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, at 181–82 (6th Cir. 2008) (stating that matters of public concern include speech relating "to any matter of political, social, or other concern to the community") (quoting *Connick*, 461 U.S. at 146). Defendant contends, however, that Funk made those statements pursuant to his official duties, and thus his speech is not protected.

We agree with Defendant. In *Garcetti,* the plaintiff was a supervising deputy district attorney and calendar deputy. *Garcetti*, 547 U.S. at 413. The plaintiff reviewed a case, and after

concluding that an affidavit for a search warrant contained misrepresentations, he spoke to his supervisors and wrote a memorandum recommending the case be dismissed. *Id.* at 413–14. The Court found that the plaintiff's expressions were made as an employee, specifically in his role as a calendar deputy. *Id.* at 422 ("[The plaintiff] did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings.") Funk, too, was "conducting his daily professional activities" when he spoke to Chief Yankowski about the arrest reports, as part of his job as a jail sergeant was to review such reports submitted by other officers. *See Haynes v. City of Circleville*, 474 F.3d 357, 364 (6th Cir. 2007) ("The fact that [the plaintiff] communicated solely to his superior also indicates that he was speaking in [his] capacity as a public employee . . . .") (second alteration in original) (internal citation and internal quotation marks omitted). Funk's speech was thus "ordinarily within the scope" of his duties as jail sergeant, and his First Amendment retaliation claim fails.

### ii.     Title VII Retaliation

Finally, we address Funk's Title VII retaliation claim.[5] As with a Title VII discrimination claim, a plaintiff may establish a Title VII retaliation claim by direct or circumstantial evidence. *Laster*, 746 F.3d at 730 (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 538 (6th Cir. 2008)). Funk again relies on circumstantial evidence, so the *McDonell Douglas* framework applies. *Id.*

"The elements of a retaliation claim are similar but distinct from those of a discrimination claim." *Id.* For a *prima facie* case of Title VII retaliation, a plaintiff must show that:

> (1) he engaged in activity protected by Title VII; (2) his exercise of such protected
> activity was known by the defendant; (3) thereafter, the defendant took an action

---

[5] Title VII's anti-retaliation provision states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made . . . unlawful . . . by this subchapter." 42 U.S.C. § 2000e-3(a).

that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.

*Id.* (citation and internal quotation marks omitted). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen*, 229 F.3d at 563 (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)).

The district court summarily concluded that Funk did not satisfy the first three elements of a *prima facie* case for retaliation and held that he did not establish causation. Viewing the evidence in the light most favorable to Funk, however, a rational juror could conclude that Funk suffered a materially adverse action and that there is a causal connection between the protected activity and the materially adverse action.

Funk does not argue that his conversations with Chief Yankowski are part of his Title VII retaliation claim. As for Funk's HR complaint, we have "repeatedly held that complaints to human resources personnel regarding potential violations of Title VII constitute protected activity for purposes of establishing a prima facie case of retaliation." *Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc.*, 495 F. App'x 651, 655 (6th Cir. 2012) (citing *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595 (6th Cir. 2007)).

Defendant knew of Funk's HR complaint, which he filed on April 12, 2016. Chief Yankowski learned of Funk's HR complaint at some point before the HR office hired a law firm to investigate the claim, which conducted the first interview on April 26, 2016.[6]

---

[6] While Chief Yankowski is the only named defendant other than the City of Lansing, others knew of the HR complaint as well. Lieutenant Bayliss, who worked in Internal Affairs during this time, was aware of the complaint before the Palmer incident (August 8, 2016). Bayliss indicated that the other officer in Internal Affairs also knew of the complaint. Captain Southworth knew of the complaint by May 4, 2016, at the latest, when the law firm interviewed him.

The district court did not discuss whether Funk suffered a materially adverse action but stated that Funk must show that Defendant took an "adverse employment action" against him. A plaintiff claiming Title VII retaliation is not required to prove an "adverse employment action" but instead a "materially adverse" action. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). "[T]hat means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.*

Some of the facts underlying Funk's constructive discharge claim also apply to his Title VII retaliation claim. Funk received an Internal Affairs complaint two days after filing his HR complaint, for which he was issued a three-day suspension. Funk received another complaint on July 3, 2016, for failing to report for duty. Funk stated that the Department called only his work phone, which he was not required to have off duty, and that the Department never called his home phone, which Funk claims would have happened for anyone else. This complaint resulted in another three-day suspension. Funk also claims that Internal Affairs did not take any action on matters that originated in March 2016 until after Funk filed his HR complaint.[7] Additionally, the Department later placed Funk on administrative leave when Internal Affairs began investigating the Palmer incident. *See Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 776 (6th Cir. 2018) (stating that a reasonable fact finder could conclude that the plaintiff suffered an adverse action where she was "referred to a fitness-for-duty exam, placed on leave, escorted out of the office, had

---

[7]     At the time of his HR complaint, Funk had two pending Internal Affairs complaints. One was dated March 14-20, 2016, for failing to complete routine shift paperwork for six consecutive days. Funk received a counseling notation for this complaint on May 16, 2016.

The other complaint was dated March 15, 2016, primarily for leaving his handgun unsecured while on duty in the jail, as jail sergeants are not permitted to be armed while on duty. Funk received a written reprimand for this on May 16, 2016. Funk, however, claims he was suspended for three days. Captain Southworth could not recall any other jail officer ever being written up for violating that policy.

her badge removed" and upon return to work was forced to choose between a severance package and a transfer to an inferior position); *Michael*, 496 F.3d at 596 (holding that putting plaintiff on brief paid administrative leave and a 90-day performance plan met the "relatively low bar" of a materially adverse action); *Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 432 (6th Cir. 2007) (remanding for reconsideration, in light of *Burlington N.*, whether the plaintiff suffered a materially adverse action when the plaintiff received a lower performance grade than prior evaluations). A rational juror could conclude that, based on the above events, Funk suffered a materially adverse action.

Funk must also establish causation between his HR complaint and the materially adverse action. "To establish a causal connection . . . a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen*, 229 F.3d at 563.

The district court held that Funk did not establish causation because of "the time lapse of several months" between his conversations with Chief Yankowski and his promotion denial. In his response to Defendants' motion for summary judgment, however, Funk asserted that the materially adverse action came after his HR complaint when Defendants issued Funk repeated disciplines, placed him on unpaid suspension, recommended his termination, and forced him to risk his monthly pension. The events following Funk's HR complaint may create a genuine issue of material fact as to whether Funk establishes causation. The Internal Affairs complaint issued two days after Funk's HR complaint is of particular concern. *Nguyen*, 229 F.3d at 563, 566–67 (explaining that temporal proximity is relevant to causation). But Funk's entire 2016 disciplinary history, in light of Captain Southworth's testimony, could lead a rational juror to conclude that the

disciplinary actions preceding Funk's resignation would not have occurred had Funk not filed his HR complaint.

### III. Conclusion

For the above reasons, we **AFFIRM** the district court's judgment with respect to Funk's racial discrimination claims under Title VII and his First Amendment retaliation claim, and **REMAND** Funk's Title VII retaliation claim for further proceedings consistent with this opinion.