IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 4, 2026 Session

## ADAM THOMAS v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY

**Appeal from the Circuit Court for Davidson County
No. 24C1359    Joseph P. Binkley, Jr., Judge**

_____

**No. M2025-00288-COA-R3-CV**

_____

A paramedic sued the Metropolitan Government of Nashville and Davidson County. He asserted that in violation of the Tennessee Public Protection Act he was discharged by the Nashville Fire Department because he refused to participate in or remain silent about the department forcing mentally competent inmates to undergo medical treatment without their consent. The Metropolitan Government of Nashville and Davidson County moved to dismiss the complaint for failure to state a claim upon which relief could be granted, and the trial court granted the motion. The paramedic appealed. We reverse the trial court's dismissal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed;
Case Remanded**

JEFFREY USMAN, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., C.J., and W. NEAL MCBRAYER J., joined.

Adam Rodrigues, Murfreesboro, Tennessee, for the appellant, Adam Thomas.

J. Brooks Fox and Benjamin A. Puckett, Nashville, Tennessee, for the appellee, Metropolitan Government of Nashville and Davidson County

**OPINION**

**I.**

Adam Thomas was employed as a paramedic with the Nashville Fire Department, which operates under the purview of the Metropolitan Government of Nashville and

Davidson County (Metro). After his employment with the fire department ended, Mr. Thomas filed a complaint against Metro, alleging that he had been constructively discharged from his employment and that this discharge was retaliatory, in violation of the Tennessee Public Protection Act. Subsequently, he filed an amended complaint. His amended complaint made the following allegations.

According to his amended complaint, Mr. Thomas began working for the Nashville Fire Department in October 2023. He was not new to being a paramedic; rather, he had eight years of experience in such a role. In his first six months with the Nashville Fire Department, Mr. Thomas was recognized with three awards for his outstanding job performance.

However, things turned for Mr. Thomas starting on January 23, 2024. On that date, Mr. Thomas responded to a call indicating an inmate needed medical attention at the Davidson County Jail. Upon arriving, Mr. Thomas was informed the inmate was refusing medical treatment and transport to the hospital. While Mr. Thomas maintained that the inmate had a right to refuse medical treatment, a nurse at the jail remained steadfast that the inmate did not have a right to refuse care or medical transport because of his status as an inmate. On this occasion, Mr. Thomas relented and transported the inmate to the hospital despite the inmate's refusal to be treated. To fulfill his duty to medically monitor a patient during transport, he took the inmate's vital signs and continued to monitor those vitals until arriving at the hospital.

At the hospital, Mr. Thomas informed the treating physician and other medical staff that the inmate had refused care but had been forced to come to the hospital. The doctor confirmed as much with the patient and ordered discharge. In their conversations with Mr. Thomas, the nurses at the hospital indicated that the inmates do have a right to refuse treatment and noted that "the jail always does this." Mr. Thomas informed the inmate that he believed his rights had been violated and apologized to him.

Mr. Thomas called his direct supervisor to ask if inmates had the right to refuse care. The supervisor indicated that he did not know but said he would consult with his superiors. Mr. Thomas also conducted his own research. His research confirmed his understanding that a mentally competent inmate has a right to refuse medical treatment. Mr. Thomas filed a detailed report at the conclusion of his shift. In his report, Mr. Thomas cited Tennessee Department of Correction policies and Tennessee Corrections Institute guidelines, indicating that prisoners have a right to refuse medical treatment.

Approximately a week later, Mr. Thomas was called into a meeting with several fire department Chiefs. Mr. Thomas alleges that in this meeting, he was reprimanded extensively for the report he filed regarding the January 23, 2024 transport of the inmate. The Chiefs indicated that he was correct that an inmate could refuse treatment, but they could not believe that he had documented the incident. In the meeting, Mr. Thomas

- 2 -

indicated that he would not transport another competent inmate to the hospital without the inmate's consent.

Less than a month later, Mr. Thomas, who had previously served in the Marine Corps, was scheduled to be in Arlington. Members of his platoon annually gathered to honor a fallen comrade who had died in Afghanistan. Mr. Thomas had been approved for vacation time, and a coworker was going to cover his shift on February 16. The coworker, however, was forbidden by superiors from covering his February 16 shift, which went uncovered.

On or around February 26, 2024, Nashville Fire Department Chief Fred Smith gave Mr. Thomas an ultimatum: "You can either resign, or I can fire you." Metro contends this ultimatum was the result of Mr. Thomas missing a single shift and not finding coverage to replace him. Mr. Thomas chose to resign to prevent a termination from becoming part of his record. Thereafter, Mr. Thomas alleges he received a text message from another paramedic employed by the fire department stating that, when that employee had previously missed a shift, the only consequence was a write-up.

Mr. Thomas filed a complaint in the Circuit Court for Davidson County, alleging retaliatory discharge under the Tennessee Public Protection Act and Tennessee common law. Specifically, Mr. Thomas alleged he was constructively discharged in retaliation for reporting and refusing to participate in the illegal practice of medically transporting an inmate to the hospital without consent.

Metro moved to dismiss the action on multiple grounds. Metro argued: (1) that constructive discharge was insufficient to state a claim under the Tennessee Public Protection Act given the Act's requirement of an overt act on the part of the employer to end the employment relationship; (2) that Mr. Thomas failed to allege an illegal activity as he was only ordered to provide medical transport, not care; (3) that Mr. Thomas failed to allege that he reported the illegal activity to someone other than the wrongdoer; and (4) that common law retaliatory discharge is not available to public employees.

The trial court dismissed Mr. Thomas's claims. The court reasoned that Metro is entitled to judgment as a matter of law because constructive discharge is not actionable under the Tennessee Public Protection Act and common law retaliatory discharge is not available to public employees. In reaching its conclusion regarding the Tennessee Public Protection Act, the trial court referenced the observation in *Howard v. Life Care Centers of America*, *Inc*., No. E2004-00212-COA-R3-CV, 2004 WL 1870067 (Tenn. Ct. App. Aug. 20, 2004), that termination "require[s] an act on the part of the employer to end the employment relationship."

Mr. Thomas appealed. He raises two issues:

1. Whether the trial court erred in holding that constructive discharge is not actionable under the Tennessee Public Protection Act as a matter of law.

2. Whether the trial court erred in dismissing [his] TPPA claim at the Tenn. R. Civ. Pro. 12.02(6) stage despite detailed factual allegations supporting a claim of constructive discharge.

Mr. Thomas does not challenge the dismissal of his common law retaliatory discharge claim; consequently, it is only Mr. Thomas's Tennessee Public Protection Act claim that is before this court.

On appeal, the parties duel over whether the Nashville Fire Department's resign-or-be-fired ultimatum satisfies the requirement under Tennessee Code Annotated section 50-1-304 that the employee be "discharged or terminated." Metro also asserts that, even if the resign-or-be-fired ultimatum constitutes a discharge or termination, the Act is still inapplicable because Mr. Thomas has not alleged illegal activity or that he reported illegal activity to someone other than the person responsible for the illegal activity. Mr. Thomas insists that his complaint sufficiently alleged illegal activity as well as his refusal to participate in illegal activity and reporting thereof.

II.

On appeal, Mr. Thomas challenges the trial court's dismissal of his Tennessee Public Protection Act claim. *See* Tenn. Code Ann. § 50-1-304(b). A Rule 12.02(6) motion to dismiss challenges the legal sufficiency of the complaint, not the strength of the plaintiff's proof. *Webb v. Nashville Area Habitat for Human., Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011). "A motion to dismiss should be granted only if it appears 'the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief.'" *Ellithorpe v. Weismark*, 479 S.W.3d 818, 824 (Tenn. 2015) (quoting *Webb*, 346 S.W.3d at 426). In reviewing a trial court's dismissal, we must construe the complaint liberally in the plaintiff's favor by taking all factual allegations in the complaint as true and drawing all reasonable inferences to the plaintiff's benefit. *Tigg v. Pirelli Tire Corp.*, 232 S.W.3d 28, 31 (Tenn. 2007); *see SNPCO, Inc. v. City of Jefferson City*, 363 S.W.3d 467, 472 (Tenn. 2012). We review de novo a dismissal pursuant to Rule 12.02(6), affording no presumption of correctness to the ruling of the trial court. *Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34, 36 (Tenn. 2015).

Adiditionally, the interpretation of statutory provisions "entails a question of law, which we review de novo upon the record with no presumption of correctness for the determination of the courts below." *Flade v. City of Shelbyville*, 699 S.W.3d 272, 281 (Tenn. 2024); *see Gleaves v. Checker Cab Transit Corp.*, 15 S.W.3d 799, 802 (Tenn. 2000).

III.

Mr. Thomas argues that the trial court erred by concluding that constructive discharge is not actionable under the Tennessee Public Protection Act. He insists that the Nashville Fire Department's resign-or-be-fired ultimatum satisfies the Act's requirement that the employee has been discharged or terminated. Metro contends that the ultimatum does not satisfy this requirement and that Mr. Thomas resigning renders the Act not even potentially applicable. The contested ground between the parties involves the interpretation of the phrase "discharged or terminated" under Tennessee Code Annotated section 50-1-304.

The Tennessee Supreme Court has explained the undertaking of statutory interpretation as follows:

> This Court's role in statutory interpretation is "to determine what a statute means." Specifically, we must decide "how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." Original public meaning is discerned through consideration of the statutory text in light of "well-established canons of statutory construction."
>
> We give the words of a statute their "natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose." In the absence of statutory definitions, we look to authoritative dictionaries published around the time of a statute's enactment.
>
> We consider the whole text of a statute and interpret each word "so that no part will be inoperative, superfluous, void or insignificant." We also consider "[t]he overall statutory framework." "[S]tatutes 'in pari materia'— those relating to the same subject or having a common purpose—are to be construed together . . . ."

*State v. Deberry*, 651 S.W.3d 918, 924-25 (Tenn. 2022) (internal citations omitted).

The statute at issue here, the Tennessee Public Protection Act, provides, in part:

(b) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.

(c)(1) Any employee terminated in violation of subsection (b) shall have a cause of action against the employer for retaliatory discharge and any other damages to which the employee may be entitled, . . . .

Tenn. Code Ann. § 50-1-304(b) & (c)(1).

While the Tennessee Public Protection Act itself does not define "discharged or terminated," the Tennessee Supreme Court has previously addressed the meaning of these terms in the context of the Act. Regarding termination, the Tennessee Supreme Court observed that termination "is defined as '[t]he complete severance of an employer-employee relationship.'" *Harman v. Univ. of Tennessee*, 353 S.W.3d 734, 738 (Tenn. 2011) (quoting Black's Law Dictionary 1482 (7th ed. 1999)). As for discharge, the Tennessee Supreme Court indicated that it has been "defined as '[t]he firing of an employee." *Id*. (quoting Black's Law Dictionary 475). The Tennessee Supreme Court observed that the plain meaning of the words "discharged" and "terminated" requires "a complete severance of the employment relationship." *Id*. The Tennessee Supreme Court also, drawing upon this court's opinion in *Howard v. Life Care Centers of America*, *Inc*., indicated that "terminated clearly requires an act on the part of the employer to end the employment relationship." *Harman*, 353 S.W.3d at 738.

Where an employer gives an employee an ultimatum to resign or be fired, courts have varied regarding precisely how to describe the employer's actions. Constructive discharge is conventionally understood as "[a]n employer's creation of working conditions that leave a particular employee or group of employees little or no choice but to resign, as by fundamentally changing the working conditions or terms of employment; an employer's course of action that, being detrimental to an employee, leaves the employee almost no option but to quit." *Discharge*, Black's Law Dictionary (12th ed. 2024). "Although constructive discharge claims generally involve employees' allegations that they effectively were forced to resign because of intolerable working conditions, an employee also may demonstrate constructive discharge if he or she resigns after the employer communicates that the employee will be fired." Barbara R. Lindemann & Paul Grossman, Employment Discrimination Law 1445 (C. Geoffrey Weirich 4th ed. 2007); *see also*, *e.g.*, *Carter v. Town of Benton*, 827 F. Supp. 2d 700, 706 (W.D. La. 2010); *Mendoza v. City of Palacios*, 962 F. Supp. 2d 868, 872 (S.D. Tex. 2013). Numerous state and federal courts have concluded that resign-or-be-fired ultimatums can constitute a constructive discharge. *See*, *e.g.*, *Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014) ("'When an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge. . . .' In other words, constructive discharge also occurs where, based on an employer's actions, 'the handwriting was on the wall and the axe was about to fall.'" (quoting *E.E.O.C. v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002))); *Kedas v. Illinois Dep't of Transp.*, 149 F.4th 951, 957 (7th Cir. 2025) (noting that "constructive discharge occurs when an employer acts in a manner that would make clear to a reasonable employee that he will be immediately fired if he does not resign" (quoting *Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 625 (7th Cir. 2019))); *Burks v. Oklahoma Pub. Co.*, 81 F.3d 975, 978 (10th Cir. 1996) ("This court has recognized that an employee can prove a constructive discharge by showing that she was faced with a choice between resigning or being fired."); *Schofield v. City of St. Paul*, 238 P.3d 603, 609 (Alaska 2010) (observing that "we have found 'resign or be fired' threats to constitute constructive

discharge").

Multiple other courts have concluded that resign-or-be-fired ultimatums are better understood simply as terminations. *See*, *e.g.*, *Odom v. Citigroup Glob. Markets Inc.*, 62 F. Supp. 3d 1330, 1339 (N.D. Fla. 2014) (indicating that where an employee is given an "alternative between resignation and facing definite, immediate termination" that the "situation is more appropriately analyzed under an actual termination theory"); *Wilder v. Cody Country Chamber of Com.*, 868 P.2d 211, 217 (Wyo. 1994) (noting that "an employee who resigned after being told to resign or be terminated was terminated for purposes of a breach of contract action"); *see also, e.g., Sutherland v. City of Pembroke Pines*, No. 25-CV-60723, 2025 WL 3055139, at *6 (S.D. Fla. Oct. 15, 2025), *report and recommendation adopted,* No. 25-CV-60723, 2025 WL 3053566 (S.D. Fla. Oct. 31, 2025); *McHenry v. McDonough*, No. 1:20-CV-5064-CAP-JKL, 2021 WL 11719873, at *7 (N.D. Ga. Oct. 7, 2021), *report and recommendation adopted,* 2021 WL 11719862 (N.D. Ga. Oct. 29, 2021); *Jones v. Bd. of Educ. of City of Chicago*, No. 20 C 4884, 2020 WL 5422857, at *4 (N.D. Ill. Sept. 10, 2020).

Metro suggests that Mr. Thomas's leaving his employment with the fire department was voluntary and that there was no act by the fire department to discharge or terminate Mr. Thomas. The trial court concluded that Mr. Thomas could not proceed under a constructive discharge theory. The trial court reached this conclusion by inferring that there was no constructive discharge in accordance with *Howard* because termination "requires an act on the part of the employer to end the employment relationship."

Under the standard for assessing motions to dismiss, we cannot agree with Metro's argument nor the trial court's conclusion that Mr. Thomas has not set forth sufficient allegations for purposes of asserting that he was discharged or terminated. Under the facts as alleged in this case, Mr. Thomas's employment relationship with the fire department did not end as a result of a voluntary choice on his part but instead as a result of the fire department's decision to end his employment. The only question for Mr. Thomas was whether the end of his employment relationship would be called a firing or a resignation, but either way it was an involuntary ending of his employment relationship with the fire department. It is the fire department that decided, and, having made the decision, acted to completely sever the employer-employee relationship between itself and Mr. Thomas. Mr. Thomas had no choice as to whether his employment relationship would be severed. Regardless of his decision, he was no longer going to be allowed to continue as an employee of the fire department. Assessed in light of the standards applicable to a motion to dismiss, Mr. Thomas set forth allegations establishing that the fire department acted to end his employment and that the end of the employment relationship was a matter in which he had no choice.

Metro argues, however, that constructive discharge cannot be a type of discharge forming the predicate for a claim under the Tennessee Public Protection Act. In support of

this contention, Metro turns to the Tennessee Supreme Court's ruling in *Lemon v. Williamson County Schools*, 618 S.W.3d 1 (Tenn. 2021).

In *Lemon*, the Tennessee Supreme Court observed that constructive discharge is a judicially crafted doctrine that is "applied to prevent employers from circumventing certain remedial statutes." *Id.* at 14. The Court further explained that constructive discharge is applicable in the context of employment discrimination "to prevent employers from escaping liability simply because they forced an employee to resign" and added that "[t]he whole point of the doctrine of constructive discharge is to legally regard a resignation as a firing rather than a voluntary quit." *Id.* at 17 (citation omitted). The Court did caution, though, that constructive discharge "is not, however, universally applicable to claims under all statutory schemes." *Id*. at 14-15. The central inquiry in assessing whether constructive discharge could apply to a suit predicated upon wrongful termination under the Teacher Tenure Act was "whether application of the doctrine of constructive discharge is compatible with the Tenure Act." *Id*. at 15.

In concluding that constructive discharge did not apply under the Tenure Act, the Tennessee Supreme Court expressly distinguished statutes involving employment discrimination and retaliatory discharge from the Tenure Act. The *Lemon* Court explained that "[t]he doctrine of constructive discharge sits comfortably alongside the discrimination and retaliatory discharge statutes; it facilitates rather than frustrates the aims of those statutes." *Id.* at 18. The Tennessee Public Protection Act protects against retaliatory discharge, and that is precisely the type of claim that Mr. Thomas has brought. *See Williams v. City of Burns*, 465 S.W.3d 96, 110 (Tenn. 2015) (noting that the Act includes protections against "both (1) discharge in retaliation for refusing to *remain silent* about illegal activities, usually referred to as whistleblowing, and (2) discharge in retaliation for refusing to *participate* in illegal activities" (quoting *VanCleave v. Reelfoot Bank*, No. W2008-01559-COA-R3-CV, 2009 WL 3518211, at *7 (Tenn. Ct. App. Oct. 30, 2009))). By comparison, application of constructive discharge in the context of the Tenure Act would, the Tennessee Supreme Court explained, frustrate the Tenure Act's purposes:

> [T]he multi-layered procedures adopted in the Tenure Act . . . are intended to give tenured teachers ample opportunity to be heard and ensure that dismissal decisions are made with transparency and by consensus of school administrators. Regardless of the reason for the decision, a tenured teacher who quits and then sues on the basis of constructive discharge leapfrogs over those procedures and frustrates a major aim of the Act.

*Lemon*, 618 S.W.3d at 18.

We fail to apprehend how the *Lemon* decision precludes application of constructive discharge as a means of establishing discharge or termination for suits under the Tennessee Public Protection Act. To the contrary, *Lemon* expressly notes the comfortable fit of

constructive discharge within retaliatory discharge statutes. While such a retaliatory discharge statute was not before the Tennessee Supreme Court in *Lemon*, and the decision is not determinative in the present case, the *Lemon* Court's reasoning certainly does not, as argued by Metro, do more to undermine rather than support Mr. Thomas's argument. Quite to the contrary, Mr. Thomas is correct that *Lemon* supports his contention.

Assuming for purposes of argument that the actions in this case are better classified as constructive discharge rather than simply as termination, the fire department still acted to end Mr. Thomas's employment. Assessed in light of the standards applicable to motions to dismiss, Mr. Thomas has adequately set forth factual contentions consistent with his having been discharged or terminated in violation of the Tennessee Public Protection Act such that his claim survives a motion to dismiss.

IV.

Nevertheless, Metro also contends that the trial court's dismissal of Mr. Thomas's suit should still be affirmed on two alternative grounds. One, Metro contends that Mr. Thomas did not allege any illegal activity. Two, Metro asserts that Mr. Thomas failed to report illegal activity to someone other than the wrongdoer who was engaged in the illegal activity. Mr. Thomas insists that he did allege illegal activity as well as his refusal to participate in and reporting of illegal activity.

The trial court did not rule for Metro on this basis, but these issues were raised and argued before the trial court. "It is well-established in Tennessee law that appellate courts have the authority to affirm a trial court's decision if it reached the right result for the wrong reason." *Blythe v. Forsythe*, No. M2023-01463-COA-R3-CV, 2025 WL 3095415, at *10 (Tenn. Ct. App. Nov. 6, 2025) (citations omitted). Accordingly, we proceed with considering Metro's arguments.

Turning first to Metro's illegal activities argument, "[i]llegal activities" is an expressly defined term under the Tennessee Public Protection Act. It is defined as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety, or welfare." Tenn. Code Ann. § 50-1-304(a)(3)(A). Here, Mr. Thomas's complaint cites to regulations applying the standards of informed consent to inmates. Tenn. Comp. R. & Regs. 1400-01-.13; *see also San Juan-Torregosa v. Garcia*, 80 S.W.3d 539, 541 (Tenn. Ct. App. 2002) ("Tennessee clearly recognizes the right of a competent adult to bodily integrity and self-determination in informed consent cases, and that a competent person can refuse medical treatment"). Thus, Mr. Thomas's complaint alleges that when he objected to providing medical transport to an inmate refusing medical treatment, he was refusing to participate in an illegal activity.

Metro does not dispute that forced medical treatment is an illegal activity, but Metro asserts that Mr. Thomas has not alleged that he himself participated in or was being asked to participate in the illegal activities. Metro asserts that Mr. Thomas was only providing medical transportation not rendering medical care. In essence, Metro's position is Mr. Thomas was just the driver, not a medical services provider.

While wheelmen, that is, getaway drivers, would likely find the *drivers are not participants in illegal activities argument* appealing, we find the argument unpersuasive. Even accepting for purposes of argument that Mr. Thomas's role was simply that of a driver, he has alleged that he was refusing to participate in an illegal activity by refusing to facilitate the illegal actions. To participate is "[t]o take part; to have a part or share with a person, in . . . a thing; to share." *Participate*, Oxford English Dictionary (providing a definition of "participate" that traces from 1531 and runs to the present); *see also Webster's Encyclopedic Unabridged Dictionary of the English Language* 1051 (1989)[1] (defining "participate" as "to take or have a part or share, as with others; partake; share (usually fol. by *in*): *to participate in profits*; *to participate in a play*"). Even if his role was limited to transport, Mr. Thomas was knowingly transporting an inmate against his expressed will for purposes of forcing medical care upon someone who refused such care. This is having a part in the illegal activity.

Furthermore, even if we were to assume that providing transport alone would be insufficient to render a person a participant in the illegal activity, Mr. Thomas alleges that the performance of his job as a paramedic went beyond simply transporting the inmate. Mr. Thomas notes that in his role as paramedic he checked the inmate's vital signs and continued to monitor them despite the inmate having refused medical care. He alleged that a paramedic is required to conduct certain medical evaluations while conducting a medical transport. Under Tennessee law, it is clear that through such actions paramedics are providing medical care. *See*, *e.g.*, *Mooney v. Sneed*, 30 S.W.3d 304, 307 (Tenn. 2000); *Zink v. Rural/Metro of Tennessee*, *L.P.*, 531 S.W.3d 698 (Tenn. Ct. App. 2017); *Holt ex rel. Waller v. City of Memphis*, No. W2000-00913-COA-R3-CV, 2001 WL 846081 (Tenn. Ct. App. July 20, 2001).

In other words, even if we accepted Metro's characterization of Mr. Thomas's role as simply that of transport, he would still be refusing to participate in illegal activities by declining to engage in facilitating forced medical care. Additionally, his role, as set forth in his complaint, was not limited simply to transport. To the contrary, Mr. Thomas was engaged and would be engaged in providing medical services as a paramedic in connection

---

[1] When interpreting statutory language, we consider "contemporaneous dictionary definitions" and "also usages and historical practices at the time of the adoption of the text." *Coblentz v. Tractor Supply Co.*, --- S.W.3d ----, 2025 WL 3704465, at *10 (Tenn. Dec. 22, 2025) (quoting *McNabb v. Harrison*, 710 S.W.3d 653, 658 (Tenn. 2025)). The "participate in" language of the Tennessee Public Protection Act was adopted as part of 1990 Tennessee Public Acts, chapter 771, § 1.

with such transport despite the refusal of medical care by the inmate.

Turning to Metro's reporting argument, Metro contends that Mr. Thomas's actions did not constitute reporting within the ambit of the Tennessee Public Protection Act because his communication was merely private or proprietary and was not reported beyond the wrongdoers themselves. Metro's argument is addressed to the "refusing to remain silent about[] illegal activities" language of Tennessee Code Annotated section 50-1-304(b) and relies upon the Tennessee Supreme Court's decision in *Haynes v. Formac Stables*, *Inc.*, 463 S.W.3d 34 (Tenn. 2015), interpreting this language.

The Tennessee Supreme Court in *Haynes* concluded that "the public policy underlying the whistleblower protections precludes relief for an employee who merely reports unlawful activity to the person responsible, even when that person is the manager, owner, or highest authority within the company." 463 S.W.3d at 40. The *Haynes* Court added that

> [w]hen an employee reports wrongdoing only to the wrongdoer—who is already aware of his or her own misconduct—there has been no exposure of the employer's illegal or unsafe practices. Such an employee necessarily fails to "blow the whistle" in a meaningful fashion because the employee has made no "effort[ ] to *bring to light* an illegal or unsafe practice."

*Id*. (citations omitted).

Underlying Metro's argument are intriguing questions involving who exactly the wrongdoers are within the fire department as to the illegal activity that Mr. Thomas reported. The questions are rendered even more complex because this matter is only at the motion to dismiss stage of the proceedings. Judicial restraint, however, speaks to not delving into these matters, given that the resolution of these questions, interesting as they are, is unnecessary in the present case to the resolution of the question before us – whether the trial court erred in dismissing Mr. Thomas's suit. According to the complaint, Mr. Thomas reported the illegal activity to persons outside of the fire department, including doctors, nurses, and an inmate. As to the latter, he not only informed the inmate that his legal rights may have been violated but also proceeded to document the violation. In other words, unlike *Haynes*, the present case does not involve a circumstance in which the only breach of silence was in telling the wrongdoer that he or she was doing wrong. *See* Tenn. Code Ann. § 50-1-304 (b)) ("No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.").

V.

For the above discussed reasons, we reverse the judgment of the Circuit Court for Davidson County. Costs of this appeal are taxed to the appellee, Metropolitan Government

of Nashville and Davidson County, for which execution may issue if necessary.  The case is remanded for such further proceedings as may be necessary and consistent with this opinion.

s/ Jeffrey Usman\
JEFFREY USMAN, JUDGE
